IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DORN,

Plaintiff,

*versus*

MICHIGAN DEPARTMENT OF
    CORRECTIONS ("MDOC"),

HARESH PANDYA, individually and
    in his official capacity as the
    Regional Medical Officer for the
    Southern Region of MDOC,

JEFFREY STIEVE, individually and in
    his official capacity as the Chief
    Medical Officer of the MDOC,

THOMAS FINCO, individually and in
    his official capacity as Correctional
    Facilities Administration Deputy
    Director of the MDOC,

DANIEL H. HEYNS, individually and
    in his official capacity as Director of
    the MDOC, and

BILL SCHUETTE, in his official
    capacity as Attorney General of
    Michigan,

Defendants.

CASE NO. 1:15-cv-359

HON. PAUL L. MALONEY

<u>JURY TRIAL DEMANDED</u>

<u>FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF AND
MONEY DAMAGES</u>

Chris E. Davis (P52159)
Mark A. Cody (P42695)
MICHIGAN PROTECTION AND
ADVOCACY SERVICE, INC.
4095 Legacy Parkway, Suite 500
Lansing, Michigan 48911-4263
Phone: (517) 487-1755
E-Mail: cdavis@mpas.org
E-Mail: mcody@mpas.org
Attorneys for Plaintiff

Kyle A. Palazzolo
Scott A. Schoettes
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 West Adams, Suite 2600
Chicago, IL 60603-6208
Phone: (312) 663-4413
E-Mail:
kpalazzolo@lambdalegal.org
sschoettes@lambdalegal.org
Attorneys for Plaintiff

Plaintiff JOHN DORN, ("DORN") by and through his attorneys, files this First Amended Complaint against Defendants MICHIGAN DEPARTMENT OF CORRECTIONS ("MDOC"); HARESH PANDYA, individually and in his official capacity as the Regional Medical Officer for the Southern Region of the MDOC; JEFFREY STIEVE, individually and in his official capacity as the Chief Medical Officer of the MDOC; THOMAS FINCO, individually and in his official capacity as Correctional Facilities Administration ("CFA") Deputy Director of the MDOC; DANIEL H. HEYNS, individually and in his official capacity as Director of the MDOC; and BILL SCHUETTE, in his official capacity as Attorney General of Michigan, (collectively "Defendants"); and alleges as follows:

## INTRODUCTION

1.     This is an action brought under Title II of the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12131 *et seq.*), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et seq.*), and 42 U.S.C. §§ 1983 and 1988 to redress the deprivation of rights secured by the laws and Constitution of the United States.

2.     As explained more fully below, this action stems from Defendants' enforcement of Michigan Policy Directive 03.04.120(NN)-(QQ) (the "Policy Directive") and the corresponding Michigan statute, MCL 791.267(3) (the "Statute"), which disproportionately and unlawfully discriminate against incarcerated individuals living with HIV.

3.     As a direct result of Defendants' enforcement of the Policy Directive and Statute, Dorn, because of his HIV-positive status, was subjected to drastically more severe punishment after allegedly engaging in sexual conduct with another prisoner.

4.     This punishment included an indefinite period of administrative segregation that ultimately lasted nearly one year; a heightened security classification; transfer to remote MDOC facilities in the Upper Peninsula; loss of a paid work assignment where he had substantial freedom and responsibility; loss of access to the law library, despite having an active

3

pending appeal that he was pursuing *pro se*; loss of educational and religious programming, some of which factored into his parole determination; inability to access the telephone on a daily basis; removal of personal property within his cell; and much more as set forth below.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws and Constitution of the United States.

6.      This Court has personal jurisdiction over Defendants because they are domiciled in the State and/or have otherwise made and established contacts with the State sufficient to permit the exercise of personal jurisdiction over them.

7.      Venue is proper in the Western District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2) because at least some Defendants reside in this district, and because a substantial part of the events that give rise to Dorn's claims occurred in Montcalm County, Michigan.

4

## PARTIES

### *Plaintiff*

8.    Since 1992, John Dorn has been living with HIV. At all times relevant to this action, his HIV was well-controlled by treatment. For more than ten years preceding the events at issue in this case, his HIV viral load had been undetectable, which means the amount of HIV in his blood was so low, it could not reliably be measured by standard viral load tests. A person with an undetectable viral load has an extremely low—possibly nonexistent—risk of transmitting HIV to others. At all times relevant to this action, Dorn was incarcerated within the MDOC. On October 18, 2014, he was released on parole.

### *Defendants*

9.    Defendant MDOC is the Michigan state agency responsible for the supervision and custody of approximately 43,000 incarcerated people. Another approximately 73,000 people on parole or probation are under its supervision. MDOC operates 33 correctional facilities throughout Michigan that house people under MDOC's supervision and custody. MDOC's administrative offices are located in the City of Lansing, Ingham County, Michigan.

10.    Defendant Pandya is sued individually and in his official capacity as the Regional Medical Officer for the Southern Region of the

MDOC. Pursuant to the Policy Directive, he was responsible for the initial determination of whether Dorn's conduct could transmit HIV.

11.    Defendant Stieve is sued individually and in his official capacity as the Chief Medical Officer of the MDOC. Pursuant to the Policy Directive, he was responsible for reviewing Defendant Pandya's determination and making a subsequent determination of whether Dorn should be reclassified to administrative segregation.

12.    Defendant Finco is sued individually and in his official capacity as CFA Deputy Director of the MDOC. Pursuant to the Policy Directive, he was responsible for reviewing Defendant Pandya's determination and making a subsequent determination of whether Dorn should be reclassified to administrative segregation.

13.    Defendant Heyns is sued individually and in his official capacity as Director of the MDOC. In his official capacity, Defendant Heyns is responsible for the overall administration of the MDOC, including the implementation and enforcement of the Policy Directive and the Statute and the actions of the above-listed Defendants, all of whom violated Dorn's rights under the laws and Constitution of the United States.

14.    Defendant Schuette is sued in his official capacity as Attorney General of Michigan. In his official capacity, Schuette has broad

responsibility for the enforcement of State laws, and he has a duty to defend State policies and laws including the Policy Directive and the Statute.

15. All of the above Defendants, and those subject to their supervision, direction, and control, intentionally performed, participated in, aided and/or abetted in some manner, the acts alleged herein, and/or proximately caused the harm alleged herein.

## STATEMENT OF FACTS

16. In April 2012, the time of the incident underlying this case, Dorn was a model prisoner. His security classification was Level I, the lowest of five possible classifications, which range from Level I to Level V.

17. Dorn was incarcerated at Carson City Correctional Facility in Montcalm County, a facility that exists primarily to house Level I and Level II prisoners.

18. The prison was near his hometown, which allowed his elderly mother, other family, and friends to visit easily.

19. Dorn had a paid work assignment within the facility earning $1.31 per day, which also provided substantial responsibility and freedom to move throughout the facility.

20.    Dorn was housed in an open dormitory setting, and with some limitations, he could interact with other prisoners 24 hours per day. He could also participate in individual or group outdoor recreation 14 hours per day; participate in individual or group indoor activities 18 hours per day; attend educational and religious programming in a group setting; eat in the dining hall with other individuals; shower on a daily basis; use telephones on a daily basis; use a kiosk to send and receive mail on a daily basis; send uncensored mail; have visitation with family and friends that included limited physical contact; possess and use personal property, including his typewriter, television, and music player; and have full commissary privileges, which allowed him to purchase extra food items.

21.    Dorn also had direct access to the prison law library and general library seven days per week for several hours at a time. Dorn was housed at the Carson City facility specifically to provide him with direct access to a law library, and he was afforded extra library time because he had an active appeal that he was pursuing *pro se*.

22.    In April 2012, Dorn had approximately two years left until he would be eligible for parole, and he had a high probability of parole based on MDOC guidelines.

### *Dorn Is Accused of Engaging in Sexual Conduct*

23.   On April 20, 2012, two prisoners alleged that they observed Dorn and another prisoner, Jerry Piotter, Jr., ("Piotter") engage in consensual oral sex.[1] Dorn allegedly was the insertive partner and did not ejaculate. The two accusers and Piotter gave written statements to MDOC personnel testifying to the alleged conduct.

24.   That same day, April 20, 2012, a memorandum was drafted by MDOC personnel reclassifying Dorn to administrative segregation. The memorandum stated, falsely, that Dorn "has been found guilty of an offense relating to PD 03.04.120," and was signed by Defendants Pandya, Stieve, and Finco. Each Defendant authorized Dorn's placement in administrative segregation. Upon information and belief, the April 20, 2012 memorandum remains in Dorn's prison records to this day.

25.   Dorn was immediately placed in administrative segregation, where he lost all of the privileges described above. Piotter, in contrast, awaited his hearing in only a Level II area.

---

[1] Dorn has consistently maintained that no sexual conduct occurred, but for purposes of this Complaint, he is not challenging the underlying charge itself.

26. On May 2, 2012, Piotter recanted and told MDOC personnel that he had only made the original statement against Dorn out of fear of the other two prisoners who had made the accusations.

27. On May 8, 2012, Dorn and Piotter finally received perfunctory hearings, during which both men were found guilty of engaging in sexual conduct. Dorn was punished with ten days detention and twenty days loss of privileges, while Piotter received no detention and thirty days loss of privileges. This was the full extent of Piotter's punishment for the alleged incident.

28. On May 10, 2012, Dorn was brought before the Security Reclassification Committee, where his reclassification to administrative segregation was affirmed indefinitely because of his HIV-positive status. Upon information and belief, Dorn's prison records reflect his reclassification for violating MDOC Policy Directive 03.04.120 to this day.

29. One week later, on May 17, 2012, he was transferred to administrative segregation at a new facility, Oaks Correctional, while Piotter remained at Carson City.

30. While in administrative segregation, Dorn was confined to his cell 23 hours per day for five days a week, and the full 24 hours per day the other two days of the week. Dorn was restrained in handcuffs, leg shackles

and/or belly chains, and he was escorted on a tether by at least two officers armed with Tasers any time that he was out of his cell. He was limited to a one-hour exercise period in an outdoor chain link cage five days per week.

31.    While in administrative segregation, Dorn was not permitted to use the telephone except for verified family emergencies; he could not send email or uncensored mail; he was limited to non-contact family visits; he was limited to three showers per week, each no longer than five minutes in duration; he could not leave his cell for meals; and he was not permitted to purchase additional food.

32.    While in administrative segregation, Dorn also was not permitted to have direct access to the prison law library, the general library, or any group activities, programs, or services, including education and religious programming.

33.    Dorn remained in administrative segregation for nearly a full year, until April 2013.

34.    Upon his release from administrative segregation, Dorn did not return to Carson City, but rather to the Level V area (the most restrictive security classification) at Baraga Correctional. Baraga Correctional is located in Baraga County, near the western edge of the Upper Peninsula.

35.     Dorn was again confined to a single-occupancy cell, identical to administrative segregation cells, for 23 hours per day, seven days per week, with a one-hour exercise period each day. He was not permitted to eat in the dining hall with other prisoners, he had limited access to personal property, and he had only limited, non-contact visitation.

36.     While classified as a Level V prisoner, Dorn had limited interaction with other prisoners and could be disciplined simply for talking or gesturing to others. Dorn had limited access to the prison law library and general library, and there was often a waiting list to attend the general library. Throughout this period as a Level V prisoner, Dorn had limited access to programs or services, including those that were required for parole considerations.

37.     In February 2014, Dorn was transferred to the Level IV area at Alger Correctional, where he remained until just prior to his parole in October 2014. Alger is also located in the Upper Peninsula. Restrictions on Level IV prisoners are only slightly relaxed as compared to Level V and are much stricter than for a Level I prisoner.

38.     After being transferred to the facilities in the Upper Peninsula at heightened security classification levels, Dorn did not receive a visitor for

nearly two years, which was in stark contrast to his time at Carson City where he often saw his elderly mother, other family, and friends.

39.    Dorn's placement in administrative segregation and heightened security classification resulted in substantial emotional and psychological trauma, including bouts of depression and thoughts of suicide. To this day, he continues to suffer emotional distress as a result of Defendants' conduct.

## *The Policy Directive and Statute*

40.    The stated purpose of Policy Directive 03.04.120 is to "reduce and control the transmission of serious communicable blood borne infections and diseases." The provisions at issue in this case specifically state:

### Misconduct Guilty Findings – HIV

NN.    Wardens shall ensure that timely reports of prisoners at their respective facilities who have been found guilty of any of the following misconduct violations are provided to the Health Unit Manager:

. . .

2. Sexual Misconduct or Sexual Assault, or an attempt to commit either, which involves even the slightest sexual penetration.

. . .

OO.   It will be presumed to be behavior which could transmit HIV if the behavior involved actual or attempted sexual penetration . . .

13

PP. If it is determined that the behavior could transmit HIV . . . the CFA Deputy Director and the Chief Medical Officer shall be informed in writing of the incident and shall review the case to determine if the prisoner should be classified to administrative segregation. If the prisoner is classified to administrative segregation, s/he shall not subsequently be reclassified without prior authorization by the CFA Deputy Director after consultation with the Chief Medical Officer.

41. The Statute, MCL 791.267(3), similarly provides for administrative segregation when an HIV-positive prisoner engages in specific actions, stating:

If a prisoner receives a positive test result [for HIV] and is subsequently subject to discipline by the department for sexual misconduct that could transmit HIV, illegal intravenous use of controlled substances, or assaultive or predatory behavior that could transmit HIV, the department shall house that prisoner in administrative segregation, an inpatient health care unit, or a unit separate from the general prisoner population, as determined by the department.

42. Both on their face and as applied to Dorn, the Policy Directive and the Statute leave HIV-positive prisoners at the mercy of prison officials, who can place them in administrative segregation indefinitely without any determination that the alleged conduct presented any significant risk of HIV transmission.

14

***No Justification Exists for the Disparate Treatment of Dorn and
Similarly Situated Prisoners***

43.   Under the ADA and Rehabilitation Act, discrimination against people living with HIV can only be justified by safety concerns after an individualized assessment based on objective medical evidence demonstrating that a significant risk of transmission exists.

44.   Dorn received no such individualized assessment, and indeed, neither the Policy Directive nor the Statute contemplates one.

45.   Moreover, assuming the alleged sexual conduct took place, Dorn posed essentially no risk of HIV transmission. Dorn's risk of transmitting HIV through the alleged incident is all but impossible for two independent but interrelated reasons: first, oral sex—particularly oral sex without ejaculation—poses little to no risk of HIV transmission; second, an undetectable viral load transforms the extremely low risk of transmission via oral sex to merely a theoretical possibility. Together, these facts establish that Dorn posed essentially no risk of HIV transmission.

46.   Defendants cannot reasonably claim to have undertaken a meaningful individualized assessment of Dorn's risk profile before they consigned Dorn to administrative segregation.

47.   Defendants' actions were not based on objective evidence, but rather the Policy Directive subsection OO's statement that "[i]t will be

presumed to be behavior which could transmit HIV if the behavior involved actual or attempted sexual penetration."

48. The scientific consensus points overwhelmingly to the conclusion that Dorn's conduct entailed virtually no risk of HIV transmission.

49. The harsh punishments Defendants inflicted substantially injured him without protecting or enhancing the health or safety of others, or serving any other legitimate purpose.

50. Dorn demands a jury trial on all issues so triable.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**(Against Defendants, MDOC and Pandya, Stieve, Finco, Heyns, and Schuette in their official capacities)**

### Violation of the Americans with Disabilities Act
### 42 U.S.C. § 12101 *et seq.*

51. Dorn realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

52. Title II of the ADA, 42 U.S.C. § 12132, states that "no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."

16

53.     As an inmate within an MDOC facility, Dorn was a "qualified individual" under Title II of the ADA.

54.     Dorn is an individual with a disability based on his HIV-positive status.

55.     Defendants violated Dorn's rights under Title II of the ADA by subjecting him to discrimination on the basis of his HIV-positive status as set forth above.

56.     The conduct in which Dorn allegedly engaged did not present a direct threat to the health or safety of others as defined under the ADA.

57.     Dorn did not receive an individualized assessment in any meaningful sense of the term; the scientific evidence overwhelmingly suggests that he posed (and still poses) little to no risk to others; and any remote or theoretical risk that he may pose certainly does not rise to the level of "significant."

58.     Thus, Defendants have violated the Americans with Disabilities Act.

## SECOND CLAIM FOR RELIEF
### (Against Defendants, MDOC and Pandya, Stieve, Finco, Heyns, and Schuette in their official capacities)

### Violation of the Rehabilitation Act
### 29 U.S.C. § 794

59.   Dorn realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

60.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, states that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

61.   As an inmate within an MDOC facility, Dorn was an "otherwise qualified individual" under the Rehabilitation Act.

62.   Dorn is an individual with a disability based on his HIV-positive status.

63.   The Michigan Department of Corrections receives federal financial assistance.

64.   Defendants violated Dorn's rights under Section 504 of the Rehabilitation Act by subjecting him to discrimination on the basis of his HIV-positive status as set forth above.

65.    The conduct in which Dorn allegedly engaged did not present a direct threat to the health or safety of others as defined under the Rehabilitation Act.

66.    Dorn did not receive an individualized assessment in any meaningful sense of the term; the scientific evidence overwhelmingly suggests that he poses little to no risk to others; and any remote or theoretical risk that he may pose certainly does not rise to the level of "significant."

67.    Thus, Defendants have violated the Rehabilitation Act.

### THIRD CLAIM FOR RELIEF
### (Against Defendants Pandya, Stieve, Finco, and Heyns in both their official and individual capacities, and Schuette in his official capacity only)

### Deprivation of Due Process
### U.S. Const. Amend. XIV
### (42 U.S.C. § 1983)

68.    Dorn realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

69.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

70.    Dorn has suffered substantial deprivations of liberty as set forth above, including but not limited to the loss of his ability to earn a livelihood

19

while in prison, the loss of his ability to interact with other prisoners during the period that he was in administrative segregation, the loss of his ability to see his family and friends since he was transferred to the Upper Peninsula, the various infringements on his day-to-day liberty resulting from his higher security classification, and the reduction of his chances of parole.

71.    He has suffered all of these deprivations in the name of prison security and the risk that he will transmit HIV, without having a meaningful opportunity to present evidence on his likelihood of transmitting HIV. He has thus been deprived of substantial elements of his liberty without due process of law.

72.    It is impermissibly overbroad for the MDOC to presume that any person living with HIV accused of sexual conduct presents a health or safety risk if the act involves any form of penetration.

73.    Thus, Defendants, acting under color of state law, deprived Dorn of rights secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Dorn respectfully requests that this Court enter judgment:

A.    Declaring that the provisions and enforcement by Defendants of MDOC Policy Directive 03.04.120(NN)-(QQ) and MCL 791.267(3) violate Dorn's rights under the Americans with Disabilities Act, the Rehabilitation Act, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

B.    Permanently enjoining enforcement by Defendants of MDOC Policy Directive 03.04.120(NN)-(QQ) and MCL 791.267(3);

C.    Ordering Defendants to expunge Dorn's prison records to remove any reference to a violation of MDOC Policy Directive 03.04.120 and ensure that if Dorn is re-incarcerated he would not face a heightened security classification as a result of the incident underlying this case;

D.    Awarding Dorn all actual damages including, but not limited to, lost wages and emotional distress;

E.    Awarding Dorn damages for violation of his constitutional rights;

F.    Awarding Dorn punitive damages to the extent permitted by law;

G.    Awarding Dorn costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws; and,

H.    Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:  May 27, 2015          /s/ Chris E. Davis
                              MICHIGAN PROTECTION AND
                              ADVOCACY SERVICE, INC.
                              4905 Legacy Parkway, Suite 500
                              Lansing, MI 48911-4264
                              (517) 487-1755 (Tel.)
                              cdavis@mpas.org
                              P52159

                              Kyle A. Palazzolo
                              Scott A. Schoettes
                              LAMBDA LEGAL DEFENSE AND
                                 EDUCATION FUND, INC.
                              105 West Adams, Suite 2600
                              Chicago, IL 60603-6208
                              (312) 663-4413 (Tel.)
                              kpalazzolo@lambdalegal.org
                              sschoettes@lambdalegal.org

                              ATTORNEYS FOR PLAINTIFF