IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

JOHN DORN,

                       Plaintiff,

   v.


MICHIGAN DEPARTMENT OF
CORRECTIONS ("MDOC"); HARESH
PANDYA, individually and in his official
capacity as the Regional Medical Officer for the
Southern Region of MDOC; JEFFREY STIEVE,
individually and in his official capacity as the
Chief Medical Officer of the MDOC; THOMAS
FINCO, individually and in his official capacity
as Correctional Facilities Administration Deputy
Director of the MDOC; DANIEL H. HEYNS,
individually and in his official capacity as
Director of the MDOC; and BILL SCHUETTE,
in his official capacity as Attorney General of
Michigan,

                       Defendants.

**CASE NO. 1:15-cv-359**


**HON. PAUL L. MALONEY**


**ORAL ARGUMENT REQUESTED**

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Chris E. Davis (P52159)
Mark A. Cody (P42695)
MICHIGAN PROTECTION AND
ADVOCACY SERVICE, INC.
4095 Legacy Parkway, Suite 500
Lansing, Michigan  48911-4263
Phone:  (517) 487-1755
E-Mail:  cdavis@mpas.org
E-Mail:  mcody@mpas.org

Kyle A. Palazzolo
Scott A. Schoettes
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 West Adams, Suite 2600
Chicago, IL  60603-6208
Phone: (312) 663-4413
E-Mail:  kpalazzolo@lambdalegal.org
E-Mail:  sschoettes@lambdalegal.org

*Attorneys for Plaintiff*

Clifton B. Schneider (P70582)
Michigan Dep't of Attorney General
Civil Litigation, Employment & Elections
Division
P.O. Box 30217
Lansing, MI 48909
Phone: (517) 355-7021
E-Mail: SchneiderC1@michigan.gov

*Attorney for Defendants*

# TABLE OF CONTENTS

CONCISE STATEMENT OF ISSUES PRESENTED...................................................... i

INTRODUCTION ............................................................................................... 1

STANDARD OF REVIEW .................................................................................. 1

STATEMENT OF FACTS .................................................................................. 2

ARGUMENT ...................................................................................................... 4

    I.    Dorn's Continuing Emotional Distress And Request That His Prison Records Be Expunged Give Him Standing To Pursue Declaratory And Injunctive Relief.................................................................................................... 5

    II.    Dorn's Reclassification To The Highest Levels Of Security For An Indefinite Period, Including A Year In Administrative Segregation, Violated His Due Process Rights. ......................................................... 8

        A.    Dorn's placement in administrative segregation and at a heightened security classification infringed on a cognizable liberty interest................ 8

        B.    Dorn was denied the due process required to challenge his segregation and heightened security classification. ................................. 11

    III.    Defendants Are Not Entitled To Qualified Immunity Because Dorn Has Alleged Both A Sufficient Hardship And Defendants' Actions Violated Clearly Established Law. ..................................................................... 14

    IV.    Defendants Are Liable For Money Damages In Their Official Capacities Under The ADA And The Rehabilitation Act. ...................................... 16

    V.    Defendant Schuette Enforces An Unconstitutional Statute And Is A Necessary Party.......................................................................................... 20

CONCLUSION.................................................................................................... 22

# CONCISE STATEMENT OF ISSUES PRESENTED

1.      Dorn continues to suffer emotional distress as a result of Defendants' conduct in this case, and he has requested that his prison records be expunged to no longer reflect the security level reclassification based on his HIV-positive status. Does Dorn's Amended Complaint contain requests that are prospective in nature, thereby entitling him to declaratory and injunctive relief? (Defs.' Issue 3)

2.      Dorn was reclassified to the highest levels of security for an indefinite period of time, including a year in administrative segregation, solely because he is living with HIV. Courts must consider several factors in evaluating due process claims such as Dorn's, including the State's explanation for the confinement, the conditions of confinement in comparison to the individual's prior placement, the frequency of hearings to determine whether the individual should remain in segregation, and the length of the heightened classification. Has Dorn alleged a deprivation of due process that defeats Defendants' motion and warrants additional fact-finding? (Defs.' Issue 2)

3.      Dorn suffered a significant and atypical hardship and did not receive adequate process, including being placed at a heightened security classification for an indefinite period of time and remaining there well after the incident in question. Did Defendants' conduct violate clearly established law thus defeating their claims of qualified immunity? (Defs.' Issue 5)

4.      In determining whether a plaintiff may sue state officials in their official capacity for money damages under Title II of the Americans with Disabilities Act ("ADA") despite the Eleventh Amendment, courts must consider: (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. Did Dorn allege a violation of the ADA that also violated the Fourteenth Amendment? If the Court does not view Defendants' conduct as a potential violation of the Fourteenth Amendment, did Congress nonetheless abrogate sovereign immunity as to this class of conduct? (Defs.' Issues 1 and 2)

5.      Defendant Schuette is responsible for enforcing the Statute at issue in this case, MCL 791.267(3) (the "Statute"), which mandates that any HIV-positive individual within the MDOC who is subject to discipline for sexual misconduct "shall" be housed in "administrative segregation, an inpatient health care unit, or a unit separate from the general prisoner population." Is Defendant Schuette a necessary party to obtain prospective injunctive relief regarding the Statute? (Defs.' Issue 4)

## INTRODUCTION

Plaintiff John Dorn ("Dorn") spent 30 months in the most restrictive levels of detention within the Michigan Department of Corrections ("MDOC"), including a year in solitary confinement, solely because of his HIV-positive status. Application of the Michigan Policy Directive 03.04.120(NN)-(QQ) (the "Policy Directive") and the corresponding Michigan statute, MCL 791.267(3) (the "Statute"), resulted in Defendants' unlawful discrimination against Dorn based on the fact he is a person living with HIV. Defendants' conduct, the Policy Directive, and Statute at issue in this case are based on outdated science and misconceptions about the transmission of HIV, and they fail to provide for the individualized assessment required by the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Rehabilitation Act"). Moreover, the conditions of Dorn's confinement were significant and atypical, and Defendants failed to provide him with the process required under the Fourteenth Amendment. Dorn has suffered and continues to suffer harm as a result of Defendants' enforcement of the Policy Directive and the Statute, and for the reasons set forth below, Defendants' Motion to Dismiss should be denied.

## STANDARD OF REVIEW

In considering Defendants' Motion to Dismiss, the Court must accept Dorn's allegations as true, and construe the complaint in his favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint should not be dismissed if it presents "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A complaint satisfies the plausibility standard when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## STATEMENT OF FACTS

At the time of the incident underlying this case, Dorn's security classification within the MDOC was Level I, the lowest of five possible classifications, which range from Level I to Level V. [Am. Complaint, D/E #15, at ¶ 16, Page ID 81.] Dorn's low classification level was the result of his good conduct over many years, and it afforded him significant benefits, including: a paid work assignment within the facility, *id.* at ¶ 19, Page ID 81; interaction with other incarcerated individuals 24 hours per day, *id.* at ¶ 20, Page ID 82; individual or group outdoor recreation, *id.*; educational or religious programming, *id.*; communal dining, *id.*; daily shower access, *id.*; access to telephone and mail on a daily basis, *id.*; visitation with family and friends that included limited physical contact, *id.*; possession and use of personal property within his dormitory, including his typewriter, television, and music player; and full commissary privileges, *id.*

In addition, Dorn had direct access to the law library and general library seven days per week for several hours at a time. *Id.* at ¶ 21, Page ID 82. Dorn was housed at the Carson City MDOC facility specifically to provide him with direct access to a law library, and he was afforded extra library time because he had an active appeal that he was pursuing pro se. *Id.* At the time of the incident, Dorn had approximately two years left until he was eligible for parole, and he had a high probability of parole based on MDOC guidelines. *Id.* at ¶ 22, Page ID 82.

On April 20, 2012, two other incarcerated men alleged that they observed Dorn and another man, Jerry Piotter, Jr., ("Piotter") engage in consensual oral sex. *Id.* at ¶ 23, Page ID 83. Dorn allegedly was the insertive partner and did not ejaculate. *Id.* That same day, April 20, 2012, prior to any hearing on the incident, a memorandum was drafted by MDOC personnel reclassifying Dorn to administrative segregation. *Id.* at ¶ 24, Page ID 83. The memorandum

falsely stated that Dorn "has been found guilty of an offense relating to PD 03.04.120," and was signed by Defendants Pandya, Stieve, and Finco. *Id.* Eighteen days *later*, Dorn and Piotter received perfunctory hearings, during which both men were found guilty of engaging in sexual conduct. *Id.*at ¶ 27, Page ID 84. On May 10, 2012, Dorn was brought before the Security Reclassification Committee, where his reclassification to administrative segregation was affirmed for an indefinite period of time because of his HIV-positive status. *Id.* at ¶ 28, Page ID 84.

Though the stated purpose of Policy Directive 03.04.120 is to "reduce and control the transmission of serious communicable blood borne infections and diseases" *id.* at ¶ 40, Page ID 87, at no point during this process was Dorn given the opportunity to contest whether the alleged conduct involved a significant risk of transmitting HIV.[1] Instead, as required by the Policy Directive, Defendants "presumed" that the conduct "could transmit HIV if the behavior involved actual or attempted sexual penetration." *Id.* Similarly, the Statute mandates that any HIV-positive individual within the MDOC who is subject to discipline for sexual misconduct "shall" be housed in "administrative segregation, an inpatient health care unit, or a unit separate from the general prisoner population." *Id.* at ¶ 41, Page ID 88.

While in administrative segregation, Dorn lost all of the privileges set forth above. He was confined to his cell 23 hours per day for five days a week, and the full 24 hours per day the other two days of the week. *Id.* at ¶ 30, Page ID 84-85. Any time he was out of his cell, he was restrained in handcuffs, leg shackles and/or belly chains, and he was escorted on a tether by at least two officers armed with Tasers. *Id.* In addition, Dorn was not permitted to use the telephone

---

[1] Dorn has alleged that it would be almost impossible to transmit HIV through the conduct alleged in the incident giving rise to this case, and his allegations must be accepted as true when considering Defendants' motion. *Id.* at ¶ 45, Page ID 89; *see also* Section IV, below.

except for verified family emergencies; he could not send email or uncensored mail; he was limited to non-contact family visits; he was limited to three showers per week, each no longer than five minutes in duration; and he was not permitted to have direct access to the prison law library, the general library, or any group activities, programs, or services, including education and religious programming. *Id.* at ¶¶ 31-32, Page ID 85.

In contrast, Piotter, the man accused of engaging in sexual conduct with Dorn, received only 30 days loss of privileges, and he remained in the Level I facility after the 30-day term with all of the privileges and freedoms of the lowest security classification until he was paroled shortly thereafter. *Id.* at ¶ 27, Page ID 84.

Dorn remained in administrative segregation for nearly a year until he was placed in a Level V area, which is the most restrictive security classification and imposed similar restrictions on Dorn, such as confinement to a cell for 23 hours per day seven days a week, limited access to the law library and programs or services, and highly restricted interactions with family, friends, or other prisoners. *Id.* at ¶¶ 33-36, Page ID 85-86. Dorn remained in the Level V area for approximately ten months, until he was transferred to a Level IV area to serve the remaining eight months of his sentence before being paroled in October 2014. *Id.* at ¶ 37, Page ID 86. Restrictions on individuals incarcerated at Level IV are only slightly relaxed as compared to Level V and are much stricter than at Level I. *Id.* In the end, Dorn received nearly 30 months, or two and a half years, of heightened security classification and restrictive conditions of confinement solely because of his HIV-positive status.

**ARGUMENT**

Despite Defendants' admission that this case should be "consider[ed] on the merits," their brief completely avoids the heart of this case: John Dorn was denied the opportunity to present

his case and spent 30 months confined to the most restrictive levels of security classification, including almost a year in administrative segregation, because he is living with HIV. [Br. in Support of Defs.' Mot. to Dismiss, D/E #18, Page ID 116.] If he was not HIV-positive, he would not have experienced such significant and atypical conditions of confinement for allegedly engaging in oral sex with another individual. This is clear because the other man charged with the exact same offense was sentenced only to 30 days loss of privileges. For the reasons set forth below, Defendants' arguments in favor of dismissal are unavailing, and Defendants' Motion to Dismiss should be denied.

## I. Dorn's Continuing Emotional Distress And Request That His Prison Records Be Expunged Give Him Standing To Pursue Declaratory And Injunctive Relief.

Despite Defendants' arguments to the contrary, Dorn has standing under Article III of the U.S. Constitution. As the Supreme Court has explained, to establish the existence of the constitutionally required "case or controversy," the plaintiff "must demonstrate a 'personal stake in the outcome' to 'assure that concrete adverseness which sharpens the presentation of issues.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citation omitted). More specifically, a plaintiff has standing where he demonstrates: (1) that he has suffered an injury in fact; (2) that his injury was caused by the defendant's conduct; and (3) that his injury is capable of being redressed by a favorable ruling from the court.[2] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff who has been injured has standing for injunctive relief if there are some "continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974). A formerly incarcerated individual may avoid mootness if some "concrete and continuing

---

[2] The requirement for future injury implicates both the "injury in fact" and "redressability" prongs.

injury"—some "collateral consequence" of his confinement—exists. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

Much of Defendants' brief is premised on the assumption that Dorn is no longer entitled to declaratory or injunctive relief because he has been paroled and therefore lacks standing, but Dorn is experiencing and properly has alleged the requisite concrete and continuing injury. In his Amended Complaint, Dorn alleges that his "prison records reflect his reclassification for violating [the Policy Directive] to this day" and "he continues to suffer emotional distress as a result of Defendants' conduct." [Am. Complaint, D/E #15, ¶¶ 24, 28, 39, Page ID 83, 84, 87.] Dorn's emotional distress stems, in part, from the fact that his prison records continue to state that he was found guilty of an offense under the Policy Directive. In addition, Dorn's Amended Complaint requests that this Court order Defendants to "expunge Dorn's prison records to remove any reference to a violation of MDOC Policy Directive 03.04.120 and ensure that if Dorn is re-incarcerated he would not face a heightened security classification as a result of the incident underlying this case." *Id*. at Page ID 95.

Courts, including the Sixth Circuit, have recognized that a request for the expungement of prison disciplinary records provides a valid basis for declaratory and injunctive relief. *See Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992) (affirming district court's order that prison records "be cleared of any mention of the discipline imposed" after finding prison regulation unlawful); *see also Walker v. United States*, 116 F.R.D. 149, 150 (S.D.N.Y. 1987) ("The judicial remedy of expungement of government records . . . exists 'to vindicate substantial rights provided by statute as well as organic law.'"); *Hatcher v. Shettle*, 1990 U.S. Dist. LEXIS 19470, at *6-7 (N.D. Ind. Jan.5, 1990) ( "The expungement of prison records . . . [is] directed to the correction of what presumably are continuing constitutional violations"). Declaratory and

injunctive relief in the context of expunging prison records are proper remedies even after the individual is released on parole. *See Lira v. Cate*, 2009 U.S. Dist. LEXIS 91292, at *70-71 (N.D. Cal. Sept. 30, 2009) (finding that "continued adverse impact on plaintiff's mental health is a collateral consequence" of incorrect prison records warranting expungement after parole); *see also Gall v. Scroggy*, 603 F.3d 346, 350-51 (6th Cir. 2010) (affirming district court decision that request for expungement was not moot when plaintiff was released and transferred to a prison in another state).[3]

Dorn's continuing emotional distress and his request that Defendants be required to clear his prison records of any reference to a violation of the Policy Directive provide a basis for this Court to order declaratory and injunctive relief. Because Dorn is requesting prospective relief, a number of Defendants' arguments fail. First, Defendants are not entitled to Eleventh Amendment immunity with respect to Dorn's Due Process claim. As Defendants' concede, an exception to Eleventh Amendment immunity has been "recognized where the suit challenges the constitutionality of a state official's action" and has requested "prospective injunctive relief." [Br. in Support of Defs.' Mot. to Dismiss, D/E #18, Page ID 108.] Accordingly, Dorn's Due Process claim against Defendants in their official capacities should not be dismissed. Moreover,

---

[3] The importance of expungement of Dorn's prison records is underscored by the Catch-22 in which he would find himself if he violates the terms of his parole after the statute of limitations has expired on his ADA and Rehabilitation Act claims. The statute of limitations is three years on the ADA and Rehabilitation Act claims. *See Censke v. County of Marquette*, 2013 U.S. Dist. LEXIS 118686, at *15 (W.D. Mich. Apr. 25, 2013). Dorn's parole lasts for two years from October 22, 2014. If Dorn violates his parole and is re-incarcerated, he likely would be placed at the Level IV security level and would no longer be able to mount a legal challenge to the process that led to his unjust classification and placement into this significantly higher security level. *See Wilson v. Zader*, 2005 U.S. Dist. LEXIS 28327, at *2 (E.D. Mich. Nov. 9, 2005) (prisoner living with HIV placed back at the same security classification upon re-incarceration). The requested declaratory and prospective injunctive relief expunging Dorn's prison records through this action eliminates the Catch-22 that would arise under these circumstances.

Defendants do not address the merits of either the ADA or Rehabilitation Act claim in their brief with respect to declaratory and injunctive relief, and thus, those claims survive as well.[4]

## II. Dorn's Reclassification To The Highest Levels Of Security For An Indefinite Period, Including A Year In Administrative Segregation, Violated His Due Process Rights.

The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake. A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," or it may arise from an expectation or interest created by state laws or policies. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

### A. Dorn's placement in administrative segregation and at a heightened security classification infringed on a cognizable liberty interest.

The pleading stage is not the proper arena for the fact-specific inquiry necessary to determine whether a cognizable liberty interest exists in these particular circumstances and/or whether that interest was illegally impinged by prison officials when they placed Dorn in administrative segregation.[5] *See Harden-Bey v. Rutter*, 524 F.3d 789, 794-95 (6th Cir. 2008). Indeed, *Harden-Bey*, the controlling case in this circuit, recognized that dismissal at the pleading

---

[4] Even if this Court finds that Dorn's prayers for declaratory and injunctive relief are moot because of his parole, the Court should nonetheless consider Dorn's claim for declaratory relief as a predicate to money damages. *See Lane v. Reid*, 559 F. Supp. 1047, 1052-53 (S.D.N.Y. 1983) (granting prisoner leave to amend his complaint to add a request for money damages and declaratory relief as a predicate to damages after prison transfer); *see also Jones v. Shankland*, 800 F.2d 77, 81 (6th Cir. 1986). In this case, Dorn has included claims for money damages, including but not limited to his lost wages, and accordingly, this Court may issue declaratory judgment as a predicate to those damages.

[5] Defendants' highlighting of the fact that the Dorn's segregation was administrative, as opposed to punitive, is without significance. [Br. in Support of Defs.' Motion to Dismiss, D/E # 18, Page ID 123.] This is a distinction in name only, and it does not change the practical effects of the liberty interest at stake. In *Harden-Bey*, the plaintiff's segregation was administrative and the Sixth Circuit found the confinement implicated his liberty interest. 524 F.3d at 793.

stage is inappropriate because the court is unable to consider a number of factors, including the "State's explanation for its confinement" of the individual and "the frequency with which hearings are given to determine whether he should remain in administrative segregation." *Id.* at 794. In distinguishing *Jones v. Baker*, 155 F.3d 810 (6th Cir. 1998) in its *Harden-Bey* opinion, the Sixth Circuit recognized that the state's purported reasons for placing an inmate in administrative segregation affects the analysis as to whether a cognizable liberty interest has been impinged. *Harden-Bey*, 524 F.3d at 794. In this case, the Defendants' explanation for Dorn's confinement in solitary is particularly important, as a dispute as to whether any increase in security level at all was justified sits at the heart of Dorn's claims. And the validity of Defendants' justification for the significantly more restrictive confinement cannot be evaluated until discovery regarding that issue has been conducted.

Other Circuit Courts similarly recognized that Due Process claims like Dorn's require a fact-based inquiry, and thus, they frequently reverse district court dismissals prior to discovery. *See Marion v. Columbia Correction Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) ("[W]e must take into consideration all of the circumstances of a prisoner's confinement in order to ascertain whether a liberty interest is implicated. Without a factual record, we cannot determine whether the actual conditions of Mr. Marion's lengthy segregation are harsher than the conditions found in the most restrictive prison in Wisconsin"); *see also Mitchell v. Horn*, 318 F.3d 523, 527, 532–33 (3d Cir. 2003) (reversing dismissal for further development of the record); *Hatch v. District of Columbia*, 184 F.3d 846, 848, 857–58 (D.C. Cir. 1999) (reversing summary judgment for "further fact-finding" regarding the conditions of confinement). This Court should similarly refuse to dismiss Dorn's claims at this stage without a more detailed factual record.

Although more fact-finding—particularly regarding Defendants' reasons for placement in solitary confinement—is necessary, Dorn has alleged facts establishing that he suffered an "atypical and significant hardship in relation to the ordinary incidents of prison life," which implicates a liberty interest and entitles the inmate to due process. *Wilkinson*, 545 U.S. at 223; *see also Sandin v. Conner*, 515 U.S. 472, 484-86 (1995); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997). Despite Defendants' over-reliance on *Wilkinson*, which emphasized that the duration of confinement is important for determining whether the hardship was atypical and significant, duration is not the only factor to be considered in this analysis. In *Harden-Bey*, the Sixth Circuit recognized that a court must consider "the nature of the more-restrictive confinement *and* its duration in relation to prison norms and to the terms of the individual's sentence." 524 F.3d at 792 (emphasis in original). Here, Dorn's segregation in solitary confinement was highly restrictive as compared to Dorn's prior Level I placement and it was for an indefinite period of time, in addition to being excessive in duration. [Am. Complaint, D/E 15, at ¶¶ 4, 28, Page ID 77, 84.] As a result, it constitutes an "atypical and significant" hardship and the conditions of confinement implicate a liberty interest.

Defendants fail to acknowledge that *Harden-Bey* is the controlling law on this issue. Cases cited by Defendants are not applicable, as they were decided before *Harden-Bey*, and they focus almost exclusively on the duration of the segregation. Of the fifteen Sixth Circuit cases cited by Defendants, all but one were decided before *Harden-Bey*. [Br. in Support of Defs.' Mot. to Dismiss, D/E #18, Page ID 120-23.] Prior to *Harden-Bey*, courts did not have explicit instruction from the Sixth Circuit on how to properly evaluate the nature of the liberty interest and the factors to be considered, as this Court does now. Furthermore, *Harden-Bey* established

that indefinite confinements implicate a liberty interest.[6] The single cited case decided since *Harden-Bey* does not involve an inmate segregated for an indefinite time, so it is easily distinguished. *See Edwards v. Worth*, 2015 U.S. Dist. LEXIS 53067, at *9-10 (M.D. Tenn. Apr. 20, 2015).

> B.   Dorn was denied the due process required to challenge his segregation and heightened security classification.

Because Dorn's administrative segregation–and heightened security classification thereafter—infringed on a protected liberty interest, he is entitled to procedural due process, which he did not receive in this case. In the prison context, the degree of process due to an inmate depends on the balancing of governmental interests and private interests. *Hewitt v. Helms*, 459 U.S. 460, 473 (1983), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472, 483 (1995). In *Hewitt*, the Court found that the government had a strong interest in segregating the plaintiff because he had a role in instigating a prison riot during which guards were assaulted and severely injured. *Id.* at 463-64, 474. Second, the Court found the prisoner's private interest was "not one of great consequence[;]" the plaintiff was transferred to segregation from an "extremely restricted environment," and therefore the change was not that significant. *Id.* at 473. The Court also found there was "no indication" that administrative segregation would negatively affect the plaintiff's parole opportunities. *Id.* Finally, the court noted there was no

---

[6] Consistent with *Harden-Bey*, district courts in the Sixth Circuit have held that allegations of indefinite confinement properly state a due process claim. *See, e.g.*, *Williams v. Lindamood*, No. 1-08-00057, 2010 U.S. Dist. LEXIS 14335, at *13-14 (M.D. Tenn. Feb. 18, 2010) (finding a due process claim based on an indefinite confinement with a duration of less than one year at the time of filing was non-frivolous); *Lebron v. Conroy*, No. 4:11CV0784, 2011 U.S. Dist. LEXIS 94014, at *10-11 (N.D. Ohio Aug. 23, 2011) ("Because Plaintiff alleges he was placed indefinitely in administrative segregation, he is arguably entitled to due process protections."); *Dickerson v. Tennessee Dep't of Correction*, No. 3:15-CV-0238, 2015 U.S. Dist. LEXIS 35948, at *10 (M.D. Tenn. Mar. 23, 2015) (holding that the plaintiff's "initially indefinite" segregation "raises a question of whether his due process rights have been violated").

"stigma" attached to the inmate's transfer. *Id.* Therefore, the Court found that the balancing test favored governmental interests and established only minimal due process requirements. *Id.* at 474.

In light of the minimal due process requirements in that case, the Court held that an informal, non-adversarial hearing could satisfy the due process standard, as long as the plaintiff was notified of the charges and had an opportunity to present his views to the official "charged with deciding whether to transfer him to administrative segregation" within a "reasonable time." *Id.* at 472, 476. In so holding, the Court observed that neither the governmental interests nor the private interests would have been materially assisted by a detailed adversarial proceeding. *Id.* at 473-74.

In this case, however, Dorn is entitled to more significant due process protections than established in *Hewitt*, as the balancing of interests favors Dorn, not the government. First, the governmental interest in Dorn's segregation is much less than in *Hewitt*. Unlike in *Hewitt,* where the inmate posed a significant risk to the safety of the guards and "security of the institution" as evidenced by his role in the prison riot, Dorn posed no risk to the guards or functioning of the prison. *Id.* at 473. Further, unlike the inmate in *Hewitt* who "posed a threat to the safety of other inmates," Dorn posed an extremely low—if not zero—risk of HIV transmission. *See id.*; Am. Complaint, D/E #15, ¶ 45, Page ID 89.

In addition, Dorn's private interest is much greater in the instant case than in *Hewitt*. Whereas in *Hewitt* the inmate was transferred into segregation from a "maximum security" institution, Dorn was transferred into solitary confinement from security classification Level I. *See* 459 U.S. at 473; Am. Complaint, D/E #15, ¶ 16, Page ID 81. Before confinement, Dorn had access to recreation 18 hours a day, interacted with others 24 hours a day, and had access to daily

showers, library use, telephone use and mail. [Am. Complaint, D/E #15, ¶¶ 20-21, Page ID 82.] In confinement, Dorn was prevented from utilizing any of these resources, was locked in a cell for 23 hours a day, and could only leave his cell in chains. *Id.* at ¶¶ 30-32, Page ID 84-85. Additionally, unlike in *Hewitt* where the plaintiff's segregation did not impact his parole opportunities, in this case, Dorn's opportunity for parole was substantially diminished. Before segregation Dorn accessed had access to religious and educational programming, which factored into his parole determination, but after transfer to solitary confinement, Dorn had no such access. *Id.* at ¶ 4, Page ID 77. Furthermore, in *Hewitt* the Court found no stigma attached to the inmate's transfer; this is very unlike the instant case, where the Defendants' actions stigmatized Dorn tremendously by branding him as a person with HIV. *See* 459 U.S. at 473. Unlike in *Hewitt*, by segregating Dorn into solitary confinement, Defendants seriously impaired his interests.

Even under the *Hewitt* standard, however, Dorn was not afforded proper due process protections because Dorn's guilt was determined days before the hearing actually took place. [Am. Complaint, D/E #15, ¶¶ 24, 27, Page ID 83-84.] Defendants Pandya, Stieve, and Finco signed a memorandum *before the hearing* that stated Dorn "has been found guilty of an offense relating to PD 03.04.120." *Id.* at ¶ 24, Page ID 83. It appears that the May 8, 2012 hearing—the ostensible goal of which was to make a determination as to Dorn's guilt for the alleged sexual misconduct—was merely perfunctory. Dorn was never given the opportunity to present evidence or call witnesses to demonstrate that the alleged conduct in this case had virtually no risk of transmitting HIV. In fact, the Policy Directive "presume[s]" that even "attempted sexual penetration" could transmit HIV. *Id.* at ¶ 40, Page ID 87-88. Unlike cases in which an individual was placed in solitary confinement for assaulting a guard or attempting to escape, Dorn was placed in administrative segregation to allegedly "reduce and control the transmission" of HIV,

yet Dorn was provided with no process to challenge this underlying presumption. This does not satisfy the "meaningful" review standard outlined in *Hewitt*. 459 U.S. at 490; *see also Toevs v. Reid*, 685 F.3d 903, 912 (10th Cir. 2012) (holding that if a hearing is a "sham or a pretext," it does not satisfy due process); *Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986); *McClary v. Coughlin,* 87 F. Supp. 2d 205, 214 (W.D.N.Y. 2000). The hearing at issue was not meaningful and did not satisfy due process as judgment was reached before evidence was considered.

Additionally, the hearing was not held within a "reasonable time" as required by *Hewitt*. 459 U.S. at 472. The alleged violation occurred on April 20, 2012. [Am. Complaint, D/E #15, ¶ 24, Page ID 83.] On this same day, Dorn was put into administrative segregation. *Id.* It was not until May 8, 2012, that he finally received his hearing. *Id.* at ¶ 27, Page ID 27. Thus, Dorn was held in segregation without a hearing for 18 days. This delay in providing a hearing alone violates the right to due process. *See Soto v. Walker*, 44 F.3d 169, 172-73 (2d Cir. 1995) (a seven-day delay violates due process).

For all of these reasons, Dorn has sufficiently alleged that he had a protected liberty interested that was deprived without procedural due process. Though Defendants have cited a number of cases in which a prisoner was unable to make such a showing, the circumstances of this case require denial of the motion to dismiss and additional fact-finding.

## III. Defendants Are Not Entitled To Qualified Immunity Because Dorn Has Alleged Both A Sufficient Hardship And Defendants' Actions Violated Clearly Established Law.

As set forth above, Dorn's confinement in administrative segregation and subsequent placement at Level V and Level IV classification involve a protected liberty interest, and he did not receive adequate process. In order to assess whether Dorn may obtain money damages from

the Defendants in their individual capacities with respect to his Due Process claim, the Court must next consider whether Defendants' conduct violated "clearly established statutory or constitutional rights." *Black v. Parke*, 4 F.3d 442, 444 (6th Cir. 1993). In determining whether a constitutional right is clearly established, this Court must first look to decisions of the Supreme Court and then to Sixth Circuit precedent. *Id.* at 445.

The Sixth Circuit Court of Appeals has recently spoken on this very issue and found that "since *Hewitt v. Helms*, prison officials have been on notice that 'administrative segregation may not be used as a pretext for indefinite confinement of an inmate.'" *Selby v. Caruso*, 734 F.3d 554, 560 (6th Cir. 2013) (denying defendant prison officials motion for summary judgment on the basis of qualified immunity). The Sixth Circuit has similarly held that arbitrarily keeping an inmate in administrative segregation after the reason for the original confinement has expired may defeat prison officials' claims for qualified immunity. *See Mackey v. Dyke*, 29 F.3d 1086, 1094-95 (6th Cir. 1994) (reversing summary judgment decision in favor of defendants) (citing *Butts v. Dutton*, 878 F.2d 1436 (6th Cir. 1989) (holding the right of the inmate not to be confined arbitrarily in administrative segregation after reason for confinement no longer existed has been "clearly established" at least since *Hewitt*)).

Defendants attempt to characterize the due process violation giving rise to a valid claim as involving only "prisoners [who] have spent long periods of time in segregation," Br. in Support of Defs.' Mot. to Dismiss, D/E #18, Page ID 121-23, but Dorn's arguments do not rest solely on the duration of his administrative segregation. In this case, Dorn was held in administrative segregation and then at a heightened and restrictive security classification for an indefinite period of time, which the *Selby* court recognized violated clearly established law. [Am. Complaint, D/E 15, at ¶¶ 4, 28, Page ID 77, 84.] Moreover, even after Dorn served time in

administrative segregation, he was not returned to the Level I classification he had before the incident precipitating this case. Instead, he was arbitrarily kept at the highest and most restrictive levels of classification for two and half years without justification and in violation of the ADA and Rehabilitation Act. Even if Dorn had posed a significant risk of transmitting HIV through the conduct alleged—which he did not—Defendants' decision not to return him to the Carson City facility and his Level I classification was arbitrary.

The cases cited by Defendants are inapposite and do not address the claims as alleged by Dorn. Accordingly, qualified immunity is not warranted and Dorn should be permitted to pursue money damages against Defendants in their individual capacities.

## IV. Defendants Are Liable For Money Damages In Their Official Capacities Under The ADA And The Rehabilitation Act.

Defendants are also liable for money damages under the ADA and Rehabilitation Act. Because Dorn has discussed the Due Process violation at length above, this Section focuses on Defendants' violation of the ADA and Rehabilitation Act. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *See* 42 U.S.C. § 12132. A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* at § 12131(2). Section 504 of the Rehabilitation Act provides that, "No otherwise qualified individual with a disability . . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Claims under both statutes are governed by the same standards.

The ADA defines "public entity" to include "any State or local government" and "any department, agency . . . or other instrumentality of a State." *See* 42 U.S.C. § 12131(1). The Supreme Court held that this term includes state prisons. *See Pa. Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Title II authorizes suits by private citizens for money damages against public entities that violate § 12132. *See* 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a). In enacting the ADA, Congress "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment . . . ." *Id*. at § 12101(b)(4). Moreover, § 12202 of the ADA provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter," which the Supreme Court has interpreted as "an unequivocal expression of Congress's intent to abrogate state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 154 (2006).

The Supreme Court further held in *United States v. Georgia* that Title II of the ADA validly abrogates state sovereign immunity insofar as it creates a private cause of action for damages against the state for conduct that actually violates the Fourteenth Amendment. The Court in *Georgia* set forth a three-part test to determine whether a plaintiff may sue a state for money damages under Title II of the ADA. The court must determine "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 159.

The ADA is a "broad, remedial statute enacted to eliminate discrimination against disabled persons. As such, it must be construed broadly to carry out its purpose." *Niece v. Fitzer*, 922 F. Supp. 1208, 1218-19 (E.D. Mich. 1995). Under the ADA and Rehabilitation Act, differential treatment of people with disabilities living with HIV, like Dorn, is permissible only after an individualized assessment has been conducted. *See Bragdon v. Abbott*, 524 U.S. 624 (1998). When an entity is attempting to justify differential treatment based on concerns related to transmission, the individualized assessment must be based on current, objective medical evidence regarding whether a significant risk of transmission exists. *Id.* at 649; *see also Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000). An individualized assessment must be conducted to ensure that people are not discriminated against based on "prejudices, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns . . . as avoiding exposing others to significant health and safety risks." *Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1290 (M.D. Ala. 2012) (striking down Alabama's segregation of prisoners living with HIV).

It is not surprising that Dorn did not receive an individualized assessment in this case because neither the Policy Directive nor the Statute contemplates one. Indeed, the Policy Directive's subsection OO explicitly states that "[i]t will be presumed to be behavior which could transmit HIV if the behavior involved actual or attempted sexual penetration." [Am. Complaint, D/E #15, ¶ 40, Page ID 87-88.] Although the Statute does not explicitly include this presumption, it does mandate that any HIV-positive individual within the MDOC who is subject to discipline for sexual misconduct "shall" be housed in "administrative segregation, an inpatient health care unit, or a unit separate from the general prisoner population." *Id*. at ¶ 41, Page ID 88. There is no evidence that Defendants conducted any assessment regarding Dorn's HIV status or

the risk of transmission based on the alleged conduct, other than their reliance on the presumption contained in the Policy Directive.

It is unlawful for Defendants to presume that any person living with HIV accused of sexual conduct involving any form of penetration presents a significant health or safety risk. Indeed, it would be almost impossible to transmit HIV through the conduct alleged in the incident giving rise to this case for two independent but interrelated reasons: first, oral sex—particularly oral sex without ejaculation—poses little to no risk of HIV transmission; second, an undetectable viral load transforms the extremely low risk of transmission via oral sex to merely a theoretical possibility.[7] Together, these facts establish that Dorn posed essentially no risk of HIV transmission—certainly not a risk that rises to the level of a "significant risk" required under the "direct threat" defense contained in the ADA and Rehabilitation Act.

Accordingly, Defendants have violated the ADA and the Rehabilitation Act as well as violated Dorn's rights under the Fourteenth Amendment, and thus, Defendants are liable for money damages.[8]

---

[7] *See* Gus Cairns, *No-one with an undetectable viral load, gay or heterosexual, transmits HIV in first two years of PARTNER study* (Mar. 4, 2014), *available at* http://www.aidsmap.com/No-one-with-an-undetectable-viral-load-gay-or-heterosexual-transmits-HIV-in-first-two-years-of-PARTNER-study/page/2832748 (discussing the results of study to look at whether people living with HIV become non-infectious if they are on antiretroviral therapy, which Dorn was); *see also* Michael Carter, *Oral sex cannot be linked to new HIV infection in 10 year Spanish couples study* (June 6, 2002), *available at* http://www.aidsmap.com/Oral-sex-cannot-be-linked-to-new-HIV-infection-in-10-year-Spanish-couples-study/page/1414272/ (discussing study in which "Over 19,000 instances of unprotected oral sex did not lead to a single case of HIV transmission.")

[8] If this Court determines that Dorn has not satisfied the second prong of the *Georgia* test, it must then consider the third step, which requires the Court to consider, insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *See Mingus v. Butler,* 591 F.3d 474, 482 (6th Cir. 2010) (finding that the third step was unnecessary when the first two prongs were satisfied). Although neither the "Supreme Court nor the Sixth Circuit has provided any guidance as to how this inquiry should be conducted or what factors are to be considered in making this decision," district courts in this circuit have looked to the harm

**V.     Defendant Schuette Enforces An Unconstitutional Statute And Is A Necessary Party.**

Dorn has made factual allegations sufficient to demonstrate that Attorney General Schuette is a proper defendant in his challenge to the Statute. Schuette is therefore not entitled to dismissal of the claims against him.

Defendant Schuette's request for dismissal hinges entirely upon the theory of *respondeat superior* in tort actions against government officials, for which the plaintiff must allege that each named defendant "through [his] own individual actions, has violated the Constitution." [Br. in Support of Defs.' Mot. to Dismiss, D/E #18, Page ID 117 (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).] However, that is not the basis for including Attorney General Schuette as a defendant in this action, and therefore, reliance upon *Ashcroft v. Iqbal* is misplaced. In that case, the Supreme Court held that a state officer is not responsible for the unconstitutional *conduct* of subordinate government officials. In the instant case, Dorn seeks to hold Schuette liable not for the unconstitutional conduct of employees of the Michigan Department of Corrections, but rather because Schuette is a necessary party for prospective relief with respect to the enforcement of the Statute, which expressly dictates the requirements of the Policy Directive. In order to ensure that any injunction with respect to the Statute has effect, Schuette must remain in this case. Indeed, the Policy Directive flows directly from the Statute's requirement and enforcement, and the federal courts consistently allow actions against state Attorneys General in such constitutional challenges. In fact, the Statute mandates that any HIV-positive individual within the MDOC who is subject to discipline for sexual misconduct "shall" be housed in "administrative segregation,

---

imposed on the plaintiff in comparison to the prison's need to preserve internal order and maintain institutional security. *Meeks v. Schofield*, 10 F. Supp. 3d 774, 797 (M.D. Tenn. 2014). As discussed above, the harm to Dorn significantly outweighs any purported interest in internal order or security, as Dorn did not pose a threat to either.

an inpatient health care unit, or a unit separate from the general prisoner population." [Am. Complaint, D/E #15, ¶ 41, Page ID 88.]

The Supreme Court provides an exception to Eleventh Amendment qualified immunity when a plaintiff seeks to challenge the constitutionality of state law. *See Ex parte Young*, 209 U.S. 123 (1908). Under this exception, a state officer "clothed with some duty in regard to the enforcement of the laws of the state," is a proper defendant in such challenges and may be enjoined from enforcing laws found unconstitutional as long as he threatens enforcement or is about to begin either criminal or civil proceedings against the plaintiff. *Id.* at 155-56; *see also Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412 (6th Cir. 1996).

The Sixth Circuit establishes a lenient standard for what constitutes a threat of enforcement. Though "general authority to enforce the laws of the state is not sufficient" to naming an official as a defendant, a plaintiff need not show "specific actions that [a state official] will take that will directly impact" the plaintiff. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015) (emphasis omitted). It is enough that a plaintiff shows that there is a "significant possibility" that the state officer's implementation of the challenged law is contrary to the plaintiff's interests. *Id.* at 1049.

In light of the case law surrounding state law challenges, Dorn's assertion that Schuette "has broad responsibility for the enforcement of State law [and] a duty to defend State policies and laws including the Policy Directive and the Statute" is not a mere "legal conclusion disguised as [a] factual allegation." [Am. Complaint, D/E #15, ¶ 14, Page ID 80-81; Br. in Support of Defs.' Motion to Dismiss, D/E # 18, Page ID 117.] Such statement *is a factual allegation* of Schuette's involvement in the enforcement of Michigan law, which is conduct that establishes his liability under *Ex parte Young* and the decades of case law that follow.

At the pleading stage, Plaintiff need not provide any greater level of detail; the degree of control which the Attorney General exercises over the enforcement of the Michigan Code and Department of Correction Directives will be properly explored through discovery. Federal Rule of Civil Procedure 8 requires only that Plaintiff "state a claim to relief that is plausible on its face[;]" in this case, that Schuette plausibly was responsible for the enforcement of the Michigan Statute and Policy Directive against Plaintiff. *Iqbal*, 566 U.S. at 663. For these reasons, Defendant Schuette is a necessary party at this stage in the litigation, and accordingly, he should not be dismissed from this case.

## CONCLUSION

For the reasons set forth above, Dorn respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety.

DATED: July 6, 2015

Chris E. Davis (P52159)
Mark A. Cody (P42695)
MICHIGAN PROTECTION AND
ADVOCACY SERVICE, INC.
4905 Legacy Parkway, Suite 500
Lansing, MI 48911-4264
(517) 487-1755 (Tel.)
cdavis@mpas.org
mcody@mpas.org

Respectfully submitted,

/s/ *Kyle A. Palazzolo*
Kyle A. Palazzolo
Scott A. Schoettes
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 West Adams, Suite 2600
Chicago, IL 60603-6208
(312) 663-4413 (Tel.)
kpalazzolo@lambdalegal.org
sschoettes@lambdalegal.org

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2015, I caused a true and correct copy of the foregoing

**Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss** to be served on all parties of

record via ECF.

/s/ *Kyle A. Palazzolo*
*Attorney for Plaintiff*