UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHN DORN,

       Plaintiff,

                               CASE NO. 1:15-CV-359

v.
                               HON. PAUL L. MALONEY

MICHIGAN DEPARTMENT OF
CORRECTIONS, et al.,

       Defendants.

_____/


## OPINION

       Plaintiff John Dorn was an inmate in the Michigan Department of Corrections ("MDOC").

During his incarceration, Dorn—an inmate infected with human immunodeficiency virus ("HIV")—

engaged in a sexual act with another prisoner, in violation of MDOC policy. As a result, he was

placed in administrative segregation. Dorn brings an action alleging violations under the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act ("RA"), 29

U.S.C. § 794, and the Fourteenth Amendment's Due Process Clause. Dorn seeks declaratory,

injunctive, and monetary relief for the alleged violations. Defendants Pandya, Finco, Stieve, and

Heyns are sued in their individual and official capacities. Defendant Schuette is sued in his official

capacity. Defendants Finco, Heyns, Pandya, Schuette, and MDOC have filed a motion to dismiss

for lack of jurisdiction and for failure to state a claim (ECF No. 16), and Defendant Stieve has also

filed a motion to dismiss for lack of jurisdiction and for failure to state a claim (ECF No. 20).

Plaintiff has filed a response (ECF No. 22), and Defendants have filed a reply (ECF No. 23). Upon

careful review of the record, the Court has decided that the motion can be resolved without oral argument.  *See* W.D. Mich. LCivR 7.3(d).  For the reasons that follow, Defendants' motions are granted in part and denied in part.

## I.

The MDOC has five security classifications for inmates, which range from Level I, the lowest, to Level V, the highest.  Originally, Dorn's security classification was Level I.  As a low-security inmate, Dorn enjoyed privileges like a paid work assignment, interaction with other inmates throughout the day, individual or group outdoor recreation, educational and religious programs, communal dining, daily shower, telephone, mail, and law library access, limited-physical-contact visits with family and friends, possession and use of personal property in his dormitory, and full commissary privileges.  (Pl.'s Br. 2, ECF No. 22, PageID.159.)

Michigan law requires placement in administrative segregation when an HIV-positive prisoner engages in specific actions:

> If a prisoner receives a positive test result [for HIV] and is subsequently subject to discipline by the [MDOC] for sexual misconduct that could transmit HIV, illegal intravenous use of controlled substances, or assaultive or predatory behavior that could transmit HIV, the department shall house that prisoner in administrative segregation, an impatient health care unit, or a unit separate from the general prisoner population, as determined by the department.

Mich. Comp. Laws § 791.267(3).  Likewise, the MDOC has created a policy based on these statutory requirements.  This policy seeks to "reduce and control the transmission of serious communicable blood borne infections and diseases[ ]" like HIV.  (Am. Compl. ¶ 40, ECF No. 15, PageID.87 (quoting Policy Directive 03.04.120 (OO).)  It presumes that "actual or attempted sexual penetration" is behavior that could transmit HIV.  (*Id.* (quoting Policy Directive 03.04.120 (OO).)  If a prisoner

is found guilty of behavior that could transmit HIV, the "CFA Deputy Director and the Chief Medical Officer shall be informed in writing of the incident and shall review the case to determine if the prisoner should be classified to administrative segregation." (*Id.* at PageID.88 (quoting Policy Directive 03.04.120 (PP).) When a prisoner is placed in administrative segregation, he "shall not subsequently be reclassified without prior authorization by the CFA Deputy Director after consultation with the Chief Medical Officer. (*Id.* (quoting Policy Directive 03.04.120 (PP).)

On April 20, 2012, two other prisoners allegedly saw Dorn and another inmate engage in oral sex. Dorn alleges that, on the same day, Defendants Pandya, Stieve, and Finco signed a memorandum classifying him to administrative segregation. (*Id.* at ¶ 24, PageID.83.) After a hearing on May 8, 2012, Dorn was found guilty of engaging in sexual conduct with another inmate. (*Id.* at ¶ 27, PageID.84.) On May 10, 2012, Dorn had a hearing before the Security Reclassification Committee "where his reclassification to administrative segregation was affirmed indefinitely because of his HIV-positive status" for violating MDOC Policy Directive 03.04.120. (*Id.* at ¶ 28, PageID.84.) Dorn remained in administrative segregation for nearly a year. (*Id.* at ¶ 4, PageID.77.) Then, he was placed in a Level V area for approximately ten months until he was transferred to a Level IV area for eight months before being paroled in October 2014. (*Id.* at ¶¶ 34-37, PageID.85-86.)

Dorn alleges that his administrative-segregation conditions were extremely restrictive. He also alleges that the conditions in Level V and IV general population were similarly restrictive. Because of his placement in administrative segregation, Dorn argues that he lost all of his Level I privileges, and was confined to his cell for 23 hours per day for five days a week and for the full 24 hours per day for the remaining two days of the week. (*Id.* at ¶ 30, PageID.84.) In contrast, the other

inmate accused of engaging in sexual conduct with Dorn lost privileges for 30 days and remained in the Level I facility. (*Id.* at ¶ 27, PageID.84.) Dorn also alleges that his sexual act with the other inmate presented "essentially no risk of HIV transmission" because he engaged in "oral sex without ejaculation" and his "undetectable viral load transforms the extremely low risk of transmission via oral sex to merely a theoretical possibility." (*Id.* at ¶ 45, PageID.89.)

## II.

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 335 U.S. 41, 47 (1957)). Although a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has now 'show[n]'– that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In ruling on a Rule 12(b)(6) motion to dismiss, the Court may only consider "the [c]omplaint

and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## III.

### A. Defendants are entitled to sovereign immunity for the official capacity due process claims

Dorn seeks relief from Defendants Finco, Heyns, Pandya, Schuette, and Stieve for Defendants' alleged deprivation of due process under 42 U.S.C. § 1983.[1] The Eleventh Amendment bars suits against a state and its departments or agencies in federal court. "There can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless [the State] has consented to the filing of such a suit." *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459 (1945); *Worcester Cnty. Trust Co. v. Riley*, 302 U.S. 292 (1937)).

Sovereign immunity also extends to any suit brought by a private party where the payment of liability must be made from the public treasury. *Edelman*, 415 U.S. at 663; *see also Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" (quoting *Land v. Dollar*, 330 U.S. 731, 738 (1947)). "'[W]hen the action

---

[1] Dorn seeks monetary damages from Defendants Finco, Heyns, Pandya, and Stieve in their individual and official capacities, but only seeks damages from Defendant Schuette in his official capacity.

is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.'" *Id.* (quoting *Ford Motor Co.*, 323 U.S. at 464). Because "a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office . . . it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted). Sovereign immunity also bars requests for injunctive relief. *Cory v. White*, 457 U.S. 85, 90-91 (1982); *cf. Ex Parte Young*, 209 U.S. 123 (1908) (noting an exception where the suit seeks prospective injunctive relief against a state official in his or her official capacity).

But Eleventh Amendment immunity is not absolute. There are two circumstances in which an individual may sue a state: waiver or abrogation. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999) (internal citations omitted). First, a state may waive sovereign immunity by consenting to the suit. *Clark v. Barnard*, 108 U.S. 436, 447-48 (1883). The State has not consented to Dorn's suit, so it has not waived sovereign immunity here. Second, Congress may abrogate sovereign immunity and authorize a suit through its power to enforce the Fourteenth Amendment—an Amendment enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance. *College Sav. Bank*, 527 U.S. at 670 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976)). Although Congress provided for a cause of action for constitutional violations under § 1983, the Supreme Court has explained, "we simply are unwilling to believe . . . that Congress intended by the general language of § 1983 to override the tradition sovereign immunity of the States." *Id.* at 341. Because Defendants Finco, Heyns, Pandya, and Schuette are sued in their official capacities as state officials, they are entitled to sovereign immunity

for the due process claims under § 1983.

**B. Defendants are also entitled to sovereign immunity for the ADA and RA claims**

Dorn also brings claims under the ADA and the RA against Defendants MDOC, Pandya, Stieve, Finco, Heyns, and Schuette, in their official capacities. RA claims "substantively mirror those brought under the [ADA]." *Roetter v. Mich. Dep't of Corr.*, 456 F. App'x 566, 569 (6th Cir. 2012) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996)). Title II of the ADA addresses discrimination in public services, which includes state correctional facilities. Prisoners can bring ADA claims under Title II, and "insofar as Title II creates a private cause of action for damages against the State for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159 (2006) (emphasis in original). Thus, the Court must first determine whether Defendants' conduct actually violates the due process clause.

Due-process concerns arise where the State "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Defendants argue that Dorn has acknowledged that the administrative segregation conditions were not much different from the Level IV and Level V general population conditions. (ECF No. 18, PageID.111-12; ECF No. 22, PageID.161.) However, Dorn alleges that the administrative segregation conditions were significantly more restrictive than the Level I general population conditions. (ECF No. 22, PageID.165-68.) He also alleges that the indefinite length of time in administrative segregation was atypical. (*Id.*)

Before a prisoner is placed in administrative segregation, there is a whole raft of judicial-type protections available to Michigan prisoners during major misconduct hearings: the accused prisoner

must receive "an evidentiary hearing without undue delay," be given "reasonable notice" of the hearing, receive "an opportunity to present evidence" and to present "oral and written arguments on issues of fact," and be allowed to submit "rebuttal evidence" to the evidence against him. *Peterson v. Johnson*, 714 F.3d 905, 912 (6th Cir. 2013) (quoting Mich. Comp. Laws § 791.252(a), (b), (d), (e)). Further, the evidence at the hearing may be admitted only on essentially the same evidentiary standard used for all Michigan administrative hearings, any objections to the evidence's admissibility must be resolved and explained on the record, and all admitted evidence must be made part of the record. *Id.* (citing Mich. Comp. Laws § 791.252(g), (h)). Also, the presiding hearing officer must be an attorney, can "administer an oath or affirmation to a witness" and "take depositions" as a part of his fact-finding role, must be impartial and must recuse if the accused files a motion successfully showing bias, must abstain from ex-parte communications with the accused prisoner and the accusing Department of Corrections staff, and must make an official record of the hearing at which he presides. *Id.* (citing Mich. Comp. Laws §§ 791.251(6); 791.252(f), (i), (j); 791.253). The hearing officer must also conclude the process by issuing a written final decision that is based solely on the preponderance of the evidence in the record, and that decision must be immediately mailed to the accused prisoner. *Id.* (citing Mich. Comp. Laws § 791.252(k)). If the prisoner disagrees with the final decision, he has a right to appeal it within the agency and then, if still displeased, to state court. *Id.* (citing Mich. Comp. Laws §§ 791.254, 791.255).

MDOC policy calls for administrative segregation when a prisoner satisfies two conditions: (1) HIV infection and (2) guilty of sexual misconduct. Dorn and his sexual partner both received hearings with the aforementioned protections and were found guilty; neither one has had the charges overturned at a rehearing or in a state-court action. Prior to Dorn's transfer to administrative

8

segregation, he received judicial-like process at his misconduct hearing. In Dorn's complaint, he alleges that on the same day of his alleged sexual misconduct–April 20, 2012–MDOC staff wrote a memorandum reclassifying Dorn to administrative segregation, before he was found guilty at his hearing on May 8, 2012. (Am. Compl ¶¶ 24, 27, ECF No. 15, PageID.83-84.) Dorn further alleges that, on May 10, 2012, the security reclassification committee affirmed Dorn's reclassification to administrative segregation indefinitely because of his HIV-positive status. (*Id.* at ¶ 28, PageID.84.)

The Due Process Clause "does not protect every change in the conditions of confinement having an impact on a prisoner." *see also Meachum v. Fano*, 427 U.S. 215, 225 (1976). A prisoner is entitled to due process protections only when a deprivation "will inevitably affect the duration of his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87. But "[a]n inmate has no liberty interest in remaining free of disciplinary or administrative segregation, as such segregation does not impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *1 (6th Cir. May 4, 1999) (quoting *Sandin*, 515 U.S. at 484); *see also Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 136 (1997); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).

Even when an inmate's detention in administrative segregation is continued past the date when the inmate should have been released, administrative segregation does not create a liberty interest such that a prison official's failure to release an inmate would amount to a procedural due process violation. *Id.* (citing *Mackey*, 111 F.3d at 463). Moreover, "courts should be hesitant to find a liberty or property interest in state-created correctional policies." *Id.* (citing *Sandin*, 515 U.S. at 483-84). "Placement in [administrative] segregation is not 'the type of atypical, significant

deprivation in which a State might conceivably create a liberty interest.'" *Id.* (citing *Sandin*, 515 U.S. at 486 and *Rimmer-Bey*, 62 F.3d at 791). Likewise, "an increase in security classification . . . does not constitute an atypical and significant hardship." *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005) (internal quotation marks omitted); *see also Meachum*, 427 U.S. at 225. Nor does an inmate have a constitutional right to be placed in a specific security classification. *Id.* (citing *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976)).

But the "duration of prison discipline [also] bears on whether a cognizable liberty interest exists." *Harden-Bey v. Rutter*, 524 F.3d 789, 793-94 (6th Cir. 2008) (limiting the application of *Jones*). This Court must consider whether the nature of Dorn's placement in administrative segregation together with its duration creates a cognizable liberty interest, and if so, whether the State has given Dorn the protection to which he is due. *Id.*

In *Harden-Bey*, the prisoner had been in administrative segregation for three years, and his confinement was "indefinite." *Id.* at 794. Similarly, Dorn argues that his "punishment included an indefinite period of administrative segregation that ultimately lasted nearly one year[.]" (Am. Compl. ¶ 4, ECF No. 15, PageID.77.) Dorn also alleges that he was transferred to administrative segregation at a new facility, was confined to his cell for 23 or 24 hours per day, was restrained in handcuffs, leg shackles, and/or belly chains, and was escorted on a tether by at least two officers any time that he was out of his cell. (*Id.* at ¶ 30, PageID.84-85.) Upon release from administrative segregation, Dorn was placed in Level V at the Baraga Correctional Facility in the Upper Peninsula for approximately 10 months. (*Id.* at ¶ 34, PageID.85.) Afterward, he was transferred to the Level IV area at the Alger Correctional Facility, which was also located in the Upper Peninsula. (*Id.* at ¶ 37, PageID.86.) Although Dorn alleges that he was placed in administrative segregation indefinitely, he ultimately

remained there for less than a year. This is significantly less time than the inmates' placement in *Harden-Bey* and *Jones*, whose confinement lasted for three years and two and a half years respectively.

The "nature and duration of an inmate's segregation may affect whether the State has implicated a liberty interest that warrants due-process protection[,]" as well as the State's rules governing the imposition of the deprivation. *Harden-Bey*, 524 F.3d at 795. Although Dorn compares his conditions in Level I to his conditions in administrative segregation and Levels IV and V to argue that he suffered an atypical and significant hardship, he cites no authority in support. In contrast, the Seventh Circuit has opined that the proper inquiry is "whether the actual conditions of [the plaintiff's] lengthy segregation [were] harsher than the conditions found in the most restrictive prison in Wisconsin." *Marion*, 559 F.3d at 699. In his complaint, Dorn admits that the conditions for Levels IV and V were similar to the conditions of administrative segregation. (Am. Compl. ¶¶ 30-37, ECF No. 15, PageID.84-86.)

Further, in *Sandin*, the Supreme Court compared the conditions of the prisoner's disciplinary confinement to the conditions of administrative segregation and protective custody. It held that placement in disciplinary segregation did not present the type of atypical, significant deprivation that implicated a protected liberty interest for three reasons: (1) the prisoner's "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody"; (2) the prisoner's "confinement did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction"; and (3) the prisoner's segregation did not "inevitably affect the duration of his sentence." *Harden-Bey*, 524 F.3d at 792 (citing *Sandin*, 515 U.S. at 486-87).

To contrast, in *Wilkinson v. Austin*, the Supreme Court held that Ohio's "Supermax" prison ("OSP") imposed an typical and significant hardship, which implicated an inmate's liberty interest. *Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005). The Supreme Court looked at the conditions imposed–1 hour a day for exercise and a prohibition on cell-to-cell conversation–to note that "these conditions would apply to most solitary confinement facilities." *Id.* at 224. The Court noted two added components of OSP: indefinite placement and parole disqualification. *Id.* "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together, they impose an atypical and significant hardship within the correctional context. It follows that [the inmates] have a liberty interest in avoiding assignment to OSP."

Similarly, because Dorn alleges that he was placed indefinitely in administrative segregation and his parole eligibility was affected, he is arguably entitled to due process protections.[2] As an initial matter, the administrative segregation conditions represent those which would apply to most solitary confinement facilities. But, like in *Wilkinson*, Dorn received an indefinite placement in administrative segregation, which the Supreme Court noted was "[u]nlike the 30-day placement in *Sandin*." *Id.* at 223. Dorn also argues that his "opportunity for parole was substantially diminished." (Pl.'s Resp. 13, ECF No. 22, PageID.170.) Taking the factual allegations in Dorn's complaint as true, he has pleaded facts that permit a plausible inference of an atypical and significant hardship.

When a liberty interest has been established, the question becomes whether the inmate was afforded sufficient protection of that liberty interest. *Matthews v. Eldridge*, 424 U.S. 319, 332-33 (1976). "Due process, however, requires only that a prisoner receive notice of the hearing, an

---

[2] Several courts have found that indefinite confinements may implicate a liberty interest. *Harden-Bey*, 524 F.3d at 795; *Lindamood*, 2010 WL 605285, at *5; *Lebron*, 2011 WL 3704067, at *1.

opportunity (when consistent with institutional safety and correctional goals) to call witnesses and present documentary evidence in his defense, and a written statement by the factfinder of the evidence relied on and the reason for the action." *Lebron v. Conroy*, No. 4:11-cv-0784, 2011 WL 3704067, at *4 (N.D. Ohio Aug. 23, 2011) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)); *see also Matthews*, 424 U.S. at 334 (noting that the "fundamental requirement of procedural due process is the right to be heard 'at a meaningful time and in a meaningful manner'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Due process does not guarantee that Dorn will receive the result he desires; it only gives him notice and an opportunity to be heard concerning his placement in administrative segregation. Dorn had a hearing; he received notice and was given an opportunity to present evidence and witnesses, and to contest his misconduct ticket. Dorn alleges that prison officials drafted a memorandum reclassifying Dorn to administrative segregation on the date of the alleged sexual misconduct so he received only a perfunctory hearing. (Am. Compl. ¶¶ 24, 28, ECF No. 15, PageID.83-84.) But the alleged memorandum alone does not permit the Court to draw a reasonable inference that Dorn was denied a meaningful opportunity to be heard.

Once an inmate is placed in administrative segregation, "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates." *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983), *abrogated on other grounds by Sandin*, 515 U.S. at 484. "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* But the decision to continue confinement must be supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). This requirement balances the procedural rights of the prisoner against the need of prison officials to have freedom to operate their facilities on a day-to-day basis. *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012). Thus, Dorn was entitled to

a periodic review of his confinement, supported by some evidence or indicia of reliability. *Id.* at 484-85.

MDOC policy requires a commission to periodically review confinement status at least weekly during the first two months of segregation and at least every 30 calendar days thereafter until the prisoner is reclassified to general population status. MDOC Policy Directive 04.05.120 § BBB. When a prisoner receives administrative or punitive segregation for more than 30 consecutive days, the Warden must approve so in writing. MDOC Policy Directive 04.05.120 § EEE. And the Warden must personally interview any prisoners who have been confined in administrative or punitive segregation for six continuous months. MDOC Policy Directive 04.05.120 § FFF. A prisoner shall be reclassified from administrative segregation only with the approval of the commission and the concurrence of the Warden. MDOC Policy Directive 04.05.120 § HHH. Dorn does not allege or argue that he did not receive this periodic review of his status. He was released from administrative segregation and placed in Level V and then Level IV general population, presumably as a result of this periodic review. Dorn has not alleged any facts to show that his due process rights were violated during the time he was kept in administrative segregation. Without an actual due process violation, the ADA and RA do not abrogate state sovereign immunity. Thus, Defendants are entitled to sovereign immunity on the ADA and RA claims as well.

### C. Some of Dorn's requests for declaratory and injunctive relief are moot

Article III of the United States Constitution limits federal court jurisdiction to a case or controversy. U.S. Const. Art. III, § 2. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "Indeed, if a case becomes moot, it does not satisfy the 'case or controversy'

14

requirement of Article III, . . . and the federal courts are powerless to decide it." *Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986) (citing *SEC v. Medical Comm. for Human Rights*, 404 U.S. 403, 407 (1972) and *United States v. City of Detroit*, 720 F.2d 443, 448 (6th Cir. 1983)).

There is an exception to the mootness doctrine when issues are capable of repetition yet evade review. However, "[t]he exception applies only where the challenged conduct is of limited duration, too short to be litigated prior to its cessation, and there is a reasonable expectation that the complaining party will be subjected to the same conduct again." *Freshour v. Ammer*, 880 F.2d 1321 (6th Cir. 1989) (unpublished table opinion) (citing *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Mere speculation that an issue may recur is not enough: "there must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (citing *Weinstein*, 423 U.S. at 149).

A prisoner's transfer to a new prison generally moots that prisoner's claims for injunctive relief related to the conditions at the first prison. *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (finding that a prisoner's request for injunctive relief from prison inspection of his mail was moot because he had been transferred to a different facility that did not search his mail). But that rule might not apply where the complained-of restriction follows the prisoner after he is transferred. *Colvin v. Caruso*, 605 F.3d 282, 295-96 (6th Cir. 2010).

Plaintiff seeks declaratory judgment that "the provisions and enforcement by Defendants of MDOC Policy Directive 03.04.120(NN)-(QQ) and [Mich. Comp. Laws §] 791.267(3) violate Dorn's rights under the [ADA], the [RA], and the Due Process Clause[.]" (Am. Compl. 21, ECF No. 15, PageID.95.) He also seeks to enjoin the State's enforcement of the policy and the statute, and requests that any reference to the policy be expunged from his prison file. (*Id.*)

The Declaratory Judgment Act provides that in a case of actual controversy, a competent court may "declare the rights and other legal relations" of a party "whether or not further relief is or could be sought." 28 U.S.C. § 2201; *Public Service Comm. of Utah v. Wycoff*, 344 U.S. 237, 241 (1952). "[T]he granting of a declaratory judgment rests in the 'sound discretion' of the court[.]" *Grand Trunk Western R.R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. *Id.* (citing E. BORCHARD, DECLARATORY JUDGMENTS 299 (2d ed. 1941)). "It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed." *Id.*

Similarly, there are several factors that the Court must consider before issuing a declaratory ruling: (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is a better or more effective remedy. *Id.* at 326 (internal citation omitted).

Dorn argues that he has standing because of continuing, present adverse effects. (Pl.'s Resp. 5-6, ECF No. 22, PageID.162-63.) He asserts that he suffers from continuing emotional distress, and that his request for prison-record expungement show that he has a concrete and continuing injury. (*Id.* at PageID.63.) Dorn claims that his emotional distress stems, in part, from the fact that his

16

prison records continue to state that he was found guilty of violating the policy. (*Id.*) He also seeks to expunge his records so that if he is re-incarcerated, he would not face a heightened security classification as a result of the incident underlying the case. (*Id.*) Dorn also argues that he may be subjected to the policy again if he is re-incarcerated. But this potential future harm is too speculative. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103-04 (1983) (noting that allegations of potential future harm were too speculative to establish the existence of a present, live controversy for declaratory or injunctive relief).

Further, Dorn is no longer subject to the MDOC policy or statute because he was paroled on October 18, 2014. (Am. Compl. ¶ 8, ECF No. 15, PageID.79.) A declaratory action here would not settle the controversy nor would it serve a useful purpose in clarifying the legal relations in issue. Also, the use of a declaratory action would likely increase friction between federal and state courts and improperly encroach upon state jurisdiction. Dorn had an opportunity to appeal the administrative segregation decision to the Michigan state courts, but he chose to file a federal lawsuit instead. A declaratory judgment will not terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. Nor will an injunction because Dorn is no longer incarcerated. In addition, a declaratory judgment would resolve the exact same question as the merits of Dorn's suit. The more effective remedy is for the Court to resolve the case on the merits. Moreover, Dorn's claim is not one that evades review; "the capable-of-repetition doctrine applies only in exception situations, and generally on where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109 (citing *DeFunis v. Odegaard*, 416 U.S. 312, 319 (1974)). As such, the Court will not grant Dorn's request for declaratory and injunctive relief as to the statute and MDOC policy.

However, Dorn has standing for his expungement request.  *See Hewitt v. Helms*, 482 U.S. 755, 766 n.1 (1987) ("Petitioners have offered no authority, nor can they, for the remarkable proposition that the request for expungement of respondent's record became moot upon his parole. Nor, since the expungement would have depended upon the finding that respondent's due process rights were violated, have they explained how the request for declaratory relief supposedly became moot.").  Dorn's release from prison has not mooted his requested relief, so this claim will remain.

### D. Defendant Schuette is entitled to dismissal from suit

Dorn's only allegations against Defendant Schuette arise from his "broad responsibility for the enforcement of State laws, and [his] duty to defend State policies and laws including the Policy Directive and the Statute."  (*Id.* at ¶ 14, PageID.81.)  Dorn generally alleges that Defendant Schuette and those subject to his supervision, direction and control, "intentionally performed, participated in, aided and/or abetted in some manner, the acts alleged [in the complaint], and/or proximately caused the harm alleged herein."  (*Id.* at ¶ 15.)  Dorn does not include any specific factual allegations that Defendant Schuette was involved in any of the actions that allegedly violated Dorn's rights.  Dorn argues that he seeks prospective relief with respect to the enforcement of the statute, which expressly dictates the requirements of the MDOC policy.  (Pl.'s Resp. 20, ECF No. 22, PageID.177.)

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The factual allegations must explicitly allege personal involvement.  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Thus, conclusory, unsupported allegations of constitutional deprivation do not satisfy this requirement. *Id.*; *see also Ana Leon T v. Federal Reserve Bank*, 823 F.3d 928, 930 (6th Cir. 1987); *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Although the Court must take all of the factual allegations in the complaint as true when reviewing a motion to dismiss, it is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

When a plaintiff seeks to challenge the constitutionality of a state law through prospective injunctive relief, an exception to sovereign immunity applies. *Ex Parte Young*, 209 U.S. at 161. An attorney general, under his power existing at common law and by virtue of state statutes, has a general duty imposed upon him, which includes the right and the power to enforce the statutes of the state, including the statute in question, if constitutional. *Id.* But "general authority to enforce the laws of the state is not sufficient." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2016). Absent enforcement or threatened enforcement by Defendant Schuette, the Eleventh Amendment bars an action against him. *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1414 (6th Cir. 1996). *Ex Parte Young* only "abrogates a state official's Eleventh Amendment immunity when a suit challenges the constitutionality of a state official's *action*." (*Id.* at 1415) (internal citations omitted) (emphasis in original).

Dorn argues that his assertion that Defendant Schuette has broad responsibility for the enforcement of state law and a duty to defend state policies and laws is not a mere legal conclusion disguised as a factual allegation. However, Dorn does not allege any specific facts to plausibly show that Defendant Schuette was responsible for the enforcement of the statute and MDOC policy against

Dorn. In fact, those responsible for enforcing the policy are the other named defendants in the case. Nor is there is an "imminent threat" of enforcement. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 437 (6th Cir. 2000). Defendant Schuette is not a necessary party to the action. Thus, Dorn has failed to allege claims against Defendant Schuette that are plausible on their face.

**E. The Court cannot properly determine whether Defendants are entitled to qualified immunity at this stage**

Qualified immunity is an affirmative defense that extends to government officials performing discretionary functions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982). Government officials acting within the scope of their authority are entitled to qualified immunity as long as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. It protects "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007).

The Sixth Circuit applies a two-part test to determine whether a government official is entitled to the defense of qualified immunity: (1) whether the plaintiff has shown a violation of a constitutionally-protected right; and, if so, (2) whether that right was clearly established such that a reasonable official would have understood that his behavior violated that right. *Shehee v. Luttrell*, 199 F.3d 295, 299-300 (6th Cir. 1999). The purpose of the clearly-established prong is to ensure that officials are on notice that their alleged conduct was unconstitutional. *Baynes v. Cleveland*, 799 F.3d 600, 610 (6th Cir. 2015) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The salient question is "'whether the state of the law [at the time of the action giving rise to the claim] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Id.* (quoting *Hope*, 536

U.S. at 741).  In other words, "in the light of pre-existing law the unlawfulness must be apparent."  *Hope*, 536 U.S. at 739 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

After a defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate that the government official violated a right that was so clearly established "that every 'reasonable official would have understood that was he [was] doing violate[d] that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson*, 483 U.S. at 640).  At a minimum, to survive a motion to dismiss on qualified-immunity grounds, a plaintiff "must allege facts that 'plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established at the time, such that a reasonable officer would have known that his conduct violated that right."  *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). "Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015); *see also Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) (observing that the fact-intensive nature of qualified immunity makes it "difficult for a defendant to claim qualified immunity on the pleadings *before discovery*" (emphasis in original)).  Given the fact-intensive nature of the qualified-immunity analysis here, the Court cannot conduct such analysis prior to discovery.

## IV.

In sum, Defendants are entitled to sovereign immunity on the official-capacity due process claims.  Because Dorn has not sufficiently alleged facts to permit the Court to make a plausible inference of an actual due process violation, Defendants Pandya, Stieve, Finco, and Heyns are

entitled to sovereign immunity for the RA and ADA claims as well. The Court will not order declaratory or injunctive relief because Dorn's claims are moot except for his expungement request. Also, because Dorn does not state a claim against Defendant Schuette, he will be dismissed from the suit. Finally, in light of the fact-intensive nature of qualified immunity analysis, the Court will reserve judgment on the merits of that issue until some discovery has taken place.


DATE: <u>June 6, 2017</u>                                    <u>   /s/ Paul L. Maloney               </u>
                                                          Paul L. Maloney
                                                          United States District Court Judge